**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SALLY MAE WHITE, | ) | |
| | ) | |
| Plaintiff, | ) | No. 15 C 8472 |
| | ) | |
| v. | ) | Magistrate Judge Cole |
| | ) | |
| CAROLYN W. COLVIN, Commissioner of Social Security, | ) ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

The plaintiff, Sally Mae White, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying her application for Disability Insurance Benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 423(d)(2), and Supplemental Security Income ("SSI") under Title XVI of the Act. 42 U.S.C. § 1382c(a)(3)(A). Ms. White asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

**I.**

**BACKGROUND**

**A.**

**The Application Process**

Ms. White was born June 15, 1958, and was in her early 50s during the period that is at issue in this case – 2007 through 2010. (Administrative Record ("R.") 165). She has a long work history. She worked as a copy machine operator for an accounting firm from 1978 to 1993. She then worked as a core maker at a steel mill for 6 years, and as a manager in a school cafeteria from 2003 through

2005. (R. 187). Her most recent job was as a housekeeper in 2006 and 2007. (R. 187). She had to leave that job when it became too strenuous on her knees; she was also having pain in her heel. (R. 79-80, 511-12). That was nearly a decade ago, and that's when she applied for DIB and SSI.

Ms. White alleged that she became disabled in February 2007, due to pain in both knees, foot pain, high blood pressure, and depression. (R. 163-167, 186). Ms. White's application was denied initially and upon reconsideration, and following a hearing before an administrative law judge. ("ALJ"). She filed suit in federal district court seeking review of that denial, and the court remanded the matter to the Commissioner. The court found that the ALJ had erred in dismissing the opinion of Ms. White's treating psychiatrist, and failed to support his finding that Ms. White was not credible. *White v. Astrue*, No. 11 C 8040, 2012 WL 6216744, at *13 (N.D. Ill. Dec. 13, 2012).

While all that was going on, in November 2010, Ms. White filed another application for DIB and SSI. This time her application was granted and she was found disabled as of November 1, 2010. And so, when the remand of the first case made it back to the Appeals Council in July of 2013, the Appeals Council vacated the earlier denial and sent the matter to an ALJ for a decision on Ms. White's ability to work prior to November 1, 2010. (R. 605).

## B.

## The Medical Record

During the administrative process, a lengthy record was compiled, including a significant volume of medical evidence. It verges on an all-but-unmanageable jumble of nearly 1000 often illegible pages, thrown together in no particular order. Understandably, neither side spends much time on it in their briefs. Suffice it to say that the evidence establishes that Ms. White suffers from – and has consistently sought treatment for – pain stemming from plantar fasciitis and degenerative arthritis

2

in her knees, and symptoms of depression. Treatment notes regarding Ms. White's depression indicate that, during the pertinent period and just after, she had serious symptoms or major impairments in several areas like working. (R. 855-62). She was repeatedly described as tearful and hopeless and expressing suicidal ideation. (R. 391-99, 461). Her treating psychiatrist found her to be markedly limited in a number of work-related areas, like maintaining a routine, and completing a normal workweek without interruption. (R. 463-64).

X-rays taken in May 2007 confirm degenerative changes, narrowing of the joints of both knees, and marginal sclerosis. (R. 330). In September 2008, x-rays of the left foot showed a very small plantar spur (R. 455); in April 2009, it was described as a "small calcaneal spur." (R. 457). X-rays of the lumbar spine in June 2009 revealed mild degenerative disc disease at L5/S1. (R. 459). In January 2010, X-rays demonstrated osteoarthritis in all three compartments of both knees. (R. 806). X-rays of the right foot in February 2010 showed mild degenerative changes and a mild hallux valgus. (R. 803). As Dr. McKenna stated, there are no further studies like MRIs due to the expense of such procedures. Beyond that, the relevant medical evidence will be discussed in connection with the analysis of the ALJ's decision.

## C.

### The Administrative Hearing

#### 1.

On April 28, 2014, the ALJ convened another hearing, at which there was testimony from Ms. White, two medical experts – psychologist Michael Cremerius and Dr. James McKenna – and vocational expert James Breen. (R. 508-58). Ms. White testified that, back in 2007, she could no longer do cleaning work because of her knees and feet. (R. 511). Her plantar fasciitis, which she said

3

flared up for about a year, got to the point where she had to wear a walking boot. (R. 512). That didn't do the trick and Ms. White had to get a cortisone injection. (R. 512). She also tried a soft cast. (R. 512). Additionally, she wore a brace on her right knee. (R. 515). Ms. White said she didn't drive, and that while she sometimes took public transit, mostly her mother drove her where she needed to go. (R. 514). She was able to heat things up in the microwave, but didn't do much more than that. (R. 514). She couldn't walk very far or stand for more than an hour. (R. 520). She could lift no more than 10 or 20 pounds. (R. 521). Ms. White didn't socialize much, other than talking to her sisters, her son, and her mother. (R. 523-24).

**2.**

After Ms. White's testimony, Dr. Cremerius testified. He read through a summary of the evidence pertaining to Ms. White's psychological condition. (R. 526-28). There was a fairly significant amount of treatment during the relevant time period, Dr. Cremerius noted that doctors found the restrictions Ms. White suffered due to her depression ranged from mild to moderate. (R. 526-28). Dr. Cremerius felt that, despite her psychological impairment, Ms. White could do work that involved simple, routine tasks and did not require more than incidental contact with the public or more than occasional contact with co-workers. (R. 529).

**3.**

Dr. McKenna then handled review of the evidence regarding Ms. White's physical condition. Like Dr. Cremerius, he summarized the medical record. (R. 536-541). Overall, he felt that the objective evidence was insufficient to support Ms. White's complaints of pain. He allowed that the lack of certain objective findings, like MRI results, was due to Ms. White's lack of quality health insurance. (R. 536-541). But, in the end, the doctor felt Ms. White was capable of light work

4

because he "didn't see enough [objective findings] to ground her and put her in sedentary [work] . . . ." (R. 541).

**4.**

Finally, the vocational expert, Mr. Breen, testified. Basically, the ALJ combined the testimony of Dr. Cremerius and Dr. McKenna to paint a picture of Ms. White's perceived capacity for work for Mr. Breen: light work, with the additional restrictions to simple, routine tasks, no more than incidental contact with the public, and no more than occasional contact with co-workers. (R. 550-51). Purportedly drawing from the Dictionary of Occupational Titles, Mr. Breen testified that Ms. White could perform her past work as a copy machine operator, or other work such as hand packager, mail clerk, or housekeeper. (R. 551). Although he did have some reservations about the public and co-worker contact restrictions, he said his testimony did not conflict with the Dictionary of Occupational Titles. (R. 551).

**II.**

**THE ALJ'S DECISION**

On June 17, 2014, the ALJ issued a decision denying Ms. White's application for DIB and SSI. The ALJ determined that, during the relevant period from April 4, 2007, through October 31, 2010, Ms. White retained the capacity to perform light work – lifting and carrying 20 pounds occasionally, 10 pounds frequently, and standing or walking for 6 hours of every 8-hour workday – as long as it was limited to simple repetitive tasks, involved only incidental contact with the public and only occasional contact with co-workers. (R. 488). The ALJ found that this allowed Ms. White to do her past relevant work as a copy machine operator, as well as other jobs like hand packager, mail clerk, and hotel housekeeper. (R. 497-98).

5

Along the way to this result, the ALJ followed the familiar five-step sequential analysis.[1] He found that Ms. White had the following severe impairments: osteoarthritis, degenerative joint disease, mild obesity, and depression. (R. 484). He summarized the testimony of the medical experts who testified at the hearing and went on to consider whether Ms. White's impairments met a listed impairment. He determined that they did not, considering her muskoloskeletal impairments, her obesity, and her depression. In terms of Ms. White's depression, the ALJ, relying on the testimony of Dr. Cremerius and an agency doctor who reviewed Ms. White's file, found she had moderate restrictions in daily living, social functioning, and concentration, persistence, and pace. (R. 485-487). As this did not meet the requirements of the listings, the ALJ moved on.

The ALJ determined that Ms. White had the residual functional capacity to perform light work – lifting and carrying 20 pounds occasionally, 10 pounds frequently, and standing or walking for 6 hours of every 8-hour workday – as long as it was limited to simple repetitive tasks, involved only incidental contact with the public and only occasional contact with co-workers. (R. 488). The ALJ

---

[1] The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

    1) is the plaintiff currently unemployed;
    2) does the plaintiff have a severe impairment;
    3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;
    4) is the plaintiff unable to perform his past relevant work; and
    5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

reviewed Ms. White's testimony and her responses to a questionnaire about her daily activities and limitations. He also reviewed the medical evidence. In the end, he said he was "not persuaded that [Ms. White's] impairments precluded her from all competitive work during the period in question . . . ." (R. 495). The ALJ noted that the record showed Ms. White consistently complained of pain, but that objective findings were generally mild, treatment had been conservative, and range of motion studies had been normal. (R. 495). Similarly, the ALJ stated that mental status exams have been generally unremarkable aside from problems with memory and attention, that Ms. White had never been hospitalized, and has reported that she finds therapy helpful. The ALJ pointed out that, although Ms. White said she does not socialize much, she kept in touch with her family, lives with others, is able to use public transportation, and enjoys church. (R. 495). In addition, the ALJ rejected the statement from Ms. White's mother – a statement that corroborated Ms. White's testimony – because "it [was] not expressed by a treating source" and because her mother was naturally sympathetic with her. (R. 497).

The ALJ noted that Ms. White's treating psychiatrist found her to be moderately limited in concentration and stress tolerance and markedly limited in a number of other areas. (R. 496). The ALJ felt these findings were out of proportion with the objective evidence. The ALJ said symptoms were mild to moderate and reiterated that Ms. White lived with others, attended to daily activities, was able to use public transit, attended church, and has not required psychiatric hospitalizations. (R. 496).

Next, the ALJ considered the reports from Ms. White's treating physician, Dr. Ezike. He noted that Dr. Ezike reported that Ms. White could only stand or walk for an hour at a time and for a total of 2-3 hours a day. She could sit for 3-4 hours a day. These limitations were due to heel pain and chronic knee pain. (R. 496). The ALJ essentially discounted these findings because "examinations

7

have shown [Ms. White] to have full range of motion, a normal gait, and no neurological defects." (R. 496). The ALJ said that Dr. Ezike based much of her opinion on Ms. White's subjective complaints. He felt that Ms. White's pain merited a limitation to light work but no more. (R. 497). The ALJ then said he accorded some weight to the opinions of the agency's reviewing physicians and that he was "crediting the medical expert's opinion [Dr. McKenna]." (R. 497).

From there, the ALJ relied on the testimony of the vocational expert to conclude that Ms. White could perform her past relevant work as a copy machine operator. He noted that the work – 794.648-022 in the Dictionary of Occupational Titles – was light and unskilled. Alternatively, the ALJ also noted that the vocational expert testified that Ms. White could perform other jobs that existed in significant number in the regional economy: hand packager, mail clerk, and hotel housekeeper. (R. 498). The ALJ added that he had determined that the vocational expert's testimony was consistent with the Dictionary of Occupational Titles. (R. 498). As a result, the ALJ found Ms. White not disabled and not entitled to benefits for the pertinent period. (R. 498-99). That decision is now before the court for review. *See* 20 C.F.R. §§404.955; 404.981; 42 U.S.C. §405(g).

### III.

### ANALYSIS

#### A.

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of

the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger*, 516 F.3d at 544. Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Far from it; over the last 12 months, the Seventh Circuit – which reviews ALJ's decisions *de novo* – has reversed half of the 26 ALJ's decisions it's considered. As Judge Posner has commented, speaking about himself and his colleagues on the Seventh Circuit, "we hear a lot of appeals, and we reverse a lot." http://www.chicagolawbulletin.com/Archives/2015/03/23/ALJ-benefits-3-23-15.aspx. An ALJ is required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

**B.**

**1.**

There are a few problems with the ALJ's opinion, but we'll begin with his conclusions about what jobs Ms. White remained capable of performing. As already noted, the ALJ relied on the vocational expert's testimony to reach the conclusion that Ms. White could perform her past work as a copy machine operator, as well as hand packager, mail clerk, or hotel housekeeper. But, review of the VE's testimony reveals that it was, to say the least, sketchy.

At the hearing, the VE began by explaining that Ms. White's past work as a core maker was medium work and unskilled. For some reason, although a description was in the record just as a description of the core maker job was in the record, the VE wasn't sure about Ms. White's job as a copy operator, so he asked her a few questions:

VE: What were your duties as a copy operator?

A: Run Machines.

VE: Okay. What type of machines? Copy machines?

ALJ: Was it an accounting firm you were working for?

A: Yes.

ALJ: Ernst and Young?

VE: How much did you lift in that job?

A: Well, with boxes . . .

VE: Of? Boxes of feathers, boxes what? What was in the boxes?

A: Paper.

VE: Let me just look this up.

(R. 550). The VE then consulted the Dictionary of Occupational Titles ("DOT") and came up with what he said was the listing closest to copy machine operator, DOT 794.684-022, which he said was

10

light work – he allowed that her job as she had performed it was medium work – and unskilled. (R. 550). After all that, oddly, the job listing the VE came up with wasn't for a copy machine operator, but for a "paper novelty maker." The job involves making things like hats, placecards, and party favors. http://www.occupationalinfo.org/79/794684022.html. Perhaps the VE was so focused on feathers that he was thinking about paper hats with feathers. In any event, "paper novelty maker" is not even close to "copy machine operator."

The ALJ then asked the VE whether, given a limitation to light work requiring her to be on her feet 6 hours a day; simple, repetitive tasks, only incidental contact with the public; no problem solving; and only occasional contact with co-workers, Ms. White could perform her past work as a copy operator. (R. 550-51). The VE said that she could perform it as it was described in the DOT – again, he was referring to the job of paper novelty maker – but not as she performed it. (R. 551). The ALJ relied on this testimony to find that Ms. White could perform her past relevant work and was not disabled. But, in doing so, the ALJ clearly didn't even check the listing to see that it was most certainly *not* for copy machine operator. *See Forsythe v. Colvin*, 813 F.3d 677, 680 (7th Cir. 2016)(when the administrative law judge said: 'the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles,' . . . the administrative law judge wasn't paying attention.").

This is a problem in the realm of SSR 00-4p and cases like *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008)(conflict obvious enough that the ALJ should have picked up on it without any assistance); and *Craft v. Astrue*, 539 F.3d 668, 681 (7th Cir. 2008), requiring the ALJ to resolve apparent conflicts between the DOT and the testimony of the VE. The difference between "copy machine operator" and "paper novelty maker" are not merely apparent, they are obvious; this is not a minor discrepancy. *Cf. Weatherbee v. Astrue*, 649 F.3d 565, 571-72 (7th Cir. 2011). But, worse,

11

the VE's testimony was just wrong. It cannot provide substantial evidence to support the ALJ's conclusion. *Allensworth v. Colvin*, 814 F.3d 831, 835 (7th Cir. 2016)(VE testimony must be reliable to provide substantial evidence to support the ALJ's decision); *Overman v. Astrue*, 546 F.3d 456, 464 (7th Cir. 2008); *Britton v. Astrue*, 521 F.3d 799, 803 (7th Cir. 2008);

The ALJ's opinion might still have been salvageable as the VE offered examples of other positions Ms. White could perform, and the ALJ relied on this testimony in finding that Ms. White could perform other work that existed in significant numbers in the economy. At the hearing, the VE testified that, given the foregoing capacity for a limited range of light work, Ms. White could perform jobs like hand packager (9500 positions regionally); mail clerk (3000 positions); and housekeeper (10,000). As is often the case, the VE made no effort to explain just what a "hand packager" or a "mail clerk" does and provided "suspiciously round numbers" as to the number of such jobs in the economy. *See Forsythe*, 813 F.3d at 680. And, the VE conceded that the DOT indicated that those jobs involved contact with the public, co-workers, and supervisors, and that it didn't say how frequently. (R. 551). That certainly could run afoul of the limitation to only occasional contact with co-workers, and most likely would run afoul of the limitation to only incidental contact with the public. When the ALJ asked the VE whether his testimony was consistent with the DOT, the VE said it was, "[e]xcept as otherwise noted about the contact with public and co-workers." (R. 551). But the ALJ didn't resolve the conflict as required, he ignored it and found that Ms. White could do these jobs regardless of her restrictions on contact with the public and co-workers. (R. 498). Again, that's not substantial evidence to support his conclusion. "A finding based on unreliable VE testimony is equivalent to a finding that is not supported by substantial evidence and must be vacated." *Britton,* 521 F.3d at 803; *Overman*, 546 F.3d at 464.

**2.**

From there, we can segue to the ALJ's RFC finding, which he employed in his hypothetical to the VE. The ALJ found that Ms. White could be on her feet – standing and/or walking – for 6 hours out of every workday. (R. 488). But what evidence supports the finding that she can spend so much time on her feet despite arthritis in both knees and recurring bouts of plantar fasciitis? *See Allensworth*, 814 F.3d at 835(ALJ must explain how he arrives at RFC finding). The ALJ said that, while the record showed consistent complaints of pain due to Ms. White's plantar fasciitis and degenerative arthritis in her knees, Ms. White had a full range of motion in her knees, a normal gait, and treatment consisted of anti-inflammatory medication and physical therapy. (R. 495).

Let's begin with the ALJ's focus on range of motion. First of all, "full range of motion in her knees" isn't a terribly accurate summary of the record. On May 9, 2007, flexion and extension were painful. (R. 299). In October 2010, there was swelling and reduced range of motion. (R. 784). There appears to be just one instance when Ms. White exhibited normal range of motion without pain. (R. 839). But, even if the ALJ had painted a more accurate picture of the record, he would still have to explain how a full range of motion alone would allow Ms. White to be on her feet most of every day. He did not. Indeed, a job like "housekeeper" which the ALJ found Ms. White could do, sounds very much like the position Ms. White testified she was forced to leave because of her knees and feet. (R. 511, 521). *See Schroeter v. Sullivan*, 977 F.2d 391, 395 (7th Cir. 1992) (questioning how full range of motion necessarily translates into ability to stand for long periods of time and lift and carry); *see also Murphy v. Colvin*, 759 F.3d 811, 817 (7th Cir. 2014)("The ALJ must determine an individual's RFC . . . based upon medical evidence as well as 'other evidence,' such as testimony by the claimant or his friends and family.").

Even Dr. McKenna's testimony indicates that there is a difference between a range of motion study and weight-bearing, which is what would be required to carry things or even to merely walk or

13

stand:

> [T]hroughout the file pretty much when she reported her symptoms she said she only had problems weight bearing. And didn't have any discomfort not weight bearing. So according to those comments, she shouldn't have difficulties with her range of motion maneuvers because they were unweighted maneuvers.

(R. 547). As such, a full range of motion says little about whether Ms. White can stand and walk for most of every day, especially given the fact that she is somewhat obese. (R. 484).

The finding of "normal gait" in the record was actually "fairly normal gait" and was necessarily confined to a few steps around a doctor's office. (R. 299). At that time, it was also reported that Ms. White had difficulty squatting and heel-toe walking. It simply is not self-evident how this translates to an ability to hold down a job involving 6 hours of walking every day. *Murphy v. Colvin*, 759 F.3d 811, 818-19 (7th Cir. 2014)(normal gait and tandem gait were not evidence that plaintiff could perform the walking and standing required by light work).

As for Ms. White's treatment, it's not clear what more the ALJ wanted beyond medications, cortisone injections, physical therapy, and a walking boot. (R. 490, 492, 493, 494). The ALJ did not inquire into Ms. White's treatment or why it was, in the ALJ's eyes, so limited. *See Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009). Perhaps it had something to do with the array of drugs Ms. White was already taking.[2] Perhaps it had to do with her limited finances and health insurance, as the medical expert, Dr. McKenna, indicated. But the ALJ didn't ask, and didn't take that into consideration while commenting on her course of treatment.

**3.**

---

[2] As of May 9, 2007, Ms. White was taking HCTZ, a diuretic; Diclofenac, an NSAID; Voltaren, another NSAID; Atenolol, a beta-blocker; Trazadone, an anti-depressant; and Zoloft/Sertraline, another anti-depressant; and Clonazepam/Klonopin, for panic attacks.

That brings us to Dr. McKenna, whose testimony really provided the basis for the ALJ's RFC determination. (R. 486, 497). Dr. McKenna said that Ms. White's claim was basically a pain claim, and due to "the fact she doesn't have Cadillac health insurance, . . . we have not gone on to get the kind of definitive tests like MRI of her feet . . . or her knees that would document" her impairments. (R. 536, 539). He noted that while Ms. White consistently complained of pain throughout the record (R. 538, 540), the trouble was there was not enough objective evidence to support her claims of pain. (R. 540). And where there was some objective evidence, he explained that it wasn't descriptive enough in terms of whether degenerative changes were mild, moderate, or worse. (R.537, 539). Dr. McKenna noted that doctors referred to her as suffering from chronic pain syndrome, which to him meant doctors weren't sure where the pain was coming from. (R. 538). Dr. McKenna also essentially dismissed Ms. White's foot problems, explaining that notes regarding that were confined to a four-month period from April 2009 to August 2009. (R. 544).

First, it would seem that Dr. McKenna missed a number of medical notes dealing with Ms. White's foot pain, because they are not limited to a four-month period. While the record is difficult to sift through, it appears as though Ms. White began treatment for her feet in Mid-2008 (R. 448) and, as she testified, continued treatment through the fall (R. 446), which led to an injection which provided only temporary relief (R. 445), after which she moved on to wearing a prescribed walking boot beginning in April 2009. (R. 443). X-rays confirmed bone spurs and degenerative changes as early as September 2008 (R. 455), and continued to do so through February 2010. (R. 803). So it wasn't a brief, isolated problem; it was chronic. Although the ALJ appeared to have caught Dr. McKenna's mistake (R. 494), he still seemed to completely disregard Ms. White's foot issues as an impairment. (R. 484). The ALJ can't ignore an entire line of evidence that way, *Thomas v. Colvin,* 745 F.3d 802, 807 (7th Cir.2014); *Villano v. Astrue,* 556 F.3d 558, 563 (7th Cir.2009), and even if he felt the

15

impairment was not severe, he had to consider it in combination with Ms. White's severe impairments. *Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014); *Thomas v. Colvin*, 745 F.3d 802, 807 (7th Cir. 2014).

But perhaps a greater problem is the demand for objective evidence. The Seventh Circuit has said time and time again that, even if the ALJ – or for that matter, the medical expert – thought that the objective evidence was insufficient, pain alone can be disabling. *Stark v. Colvin*, 813 F.3d 684, 687-88 (7th Cir. 2016); *Carradine v. Barnhart,* 360 F.3d 751, 753 (7th Cir.2004). The court has also made it clear, time and time again, testimony of severe pain cannot be disregarded simply because it is not supported by objective medical evidence. *Stark*, 813 F.3d at 688; *Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015); *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014). But, by adopting the medical expert's testimony and opinion as his own, the ALJ ran afoul of this case law.

**4.**

Any one among these issues – vocational testimony, RFC support, or focus on objective evidence for pain – is enough to warrant a remand in this case. Even putting Ms. White's psychological impairment aside, which even Dr. McKenna conceded would likely have an adverse effect on one's pain threshold (R. 548), it's difficult to get past the ALJ's finding that a woman with a combination of bad knees and bad feet could spend 6 hours of every workday on her feet, walking and/or standing. But, adding Ms. White's psychological impairment to the mix, the ALJ's decision is even more difficult to accept.

The ALJ, taking his cue from Dr. Cremerius, found that Ms. White had moderate difficulties in concentration, persistence, or pace, but that she could nevertheless perform "simple repetitive tasks." (R. 488). The Commissioner has argued that this was fine (Dkt. # 17, at 7), despite Seventh Circuit holdings concluding that restrictions like "simple repetitive tasks" do not adequately account

16

for limitations in concentration, persistence, and pace. *See, e.g.*, *Yurt v. Colvin*, 758 F.3d 850, 858-59 (7th Cir. 2014)(". . .we have repeatedly rejected the notion that a hypothetical like the one here confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace."). But the Commissioner is unconvincing. Contrary to the Commissioner's position (Dkt. #17, at 7), this is not a case like *Johansen v. Barnhart,* 314 F.3d 283, 289 (7th Cir. 2002), where the agency psychologist accounted for deficiencies in concentration or pace with a restriction to *low-stress* work or, as another example, work that did not involve production quotas. All we have here is a restriction to "simple repetitive tasks."

It has to be said that we continue to have difficulty accepting the Commissioner's position, whether espoused by ALJs or agency psychologists, that it is self-evidence that a person who has trouble concentrating or maintaining pace can do a job that requires her to perform repetitive tasks all day. If Ms. White's concentration waxes and wanes, or she can't maintain pace, how, for instance, can she perform a "hand packager" job that most likely involves dealing with a stream of items throughout the workday at a regular pace? *See Wilcox v. Colvin*, 2015 WL 135441, at *5 (N.D. Ill. Jan. 9, 2015); *Gomez v. Colvin*, 73 F. Supp. 3d 921, 932 (N.D. Ill. 2014); *Mack v. Colvin*, 2014 WL 5630599, at *5 (N.D. Ill. Nov. 4, 2014).

We haven't even touched on the ALJ's credibility determination which, given his reliance on Dr. McKenna's testimony, was too dependent on the requirement of objective evidence of pain. *See Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015)(plaintiff's cannot be disregarded simply because it is not corroborated by medical evidence); *Pierce*, 739 F.3d at 1050(ALJ may not rest his credibility determination too heavily on the absence of objective support for plaintiff's complaints). It's also worth pointing out that, in finding Ms. White not credible, the ALJ essentially ignored her work

history. When her copy machine operator job ended, she took another more strenuous job at a steel mill. And she continued to try to work in other positions after that despite her impairments. *See Stark v. Colvin*, 813 F.3d 684, 689 (7th Cir. 2016)(ALJ should acknowledge plaintiff's work history and efforts to maintain employment despite impairments).

Then there's the ALJ's outright dismissal of the statement of Ms. White's mother – who essentially corroborated her daughter's testimony – because she is not a "treating source" and would be sympathetic to her daughter. (R. 497). As for the latter rationale, the Seventh Circuit has criticized it as a basis for discarding testimony before. *Garcia v. Colvin*, 741 F.3d 758, 761 (7th Cir. 2013). As for the former, no, Ms. White's mom is not her treating doctor and few if any claimant's relatives in these cases would have such status. Ironically, the two people whose testimony the ALJ put the most stock in were not treating sources either.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is reversed and remanded for further proceedings.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE: 4/18/16**